FILED

01/24/2018

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 5, 2017

**RANDY POOLE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 13-01570       W. Mark Ward, Judge**

_____

**No. W2017-00475-CCA-R3-PC**

_____

The petitioner, Randy Poole, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received effective assistance of counsel at trial and in filing his motion for new trial. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Monica A. Timmerman, Bartlett, Tennessee, for the appellant, Randy Poole.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Holly Palmer, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner participated in an aggravated burglary on September 11, 2012. For his participation, a Shelby County jury convicted him of the lesser-included offense of facilitation of aggravated burglary for which the petitioner received an eight-year sentence. Despite the untimely filing of his motion for new trial, this Court affirmed his conviction and sentence on direct appeal. In doing so, this Court summarized the factual and procedural history of the petitioner's case as follows:

In March 2013, the Shelby County Grand Jury returned an indictment charging the [petitioner] and co-defendant, Christopher Sims,

with aggravated burglary.  The [petitioner] proceeded to trial on October 7, 2013.

At trial, Matthew Carragher testified that he owned a house on Hodges Street in Memphis and that it was a rental property, which was managed by a property management company.  The property was vacant on September 11, 2012.  On that day, he received a phone call from the management company informing him that the police had "caught two guys coming out of the house trying to steal the stove and the refrigerator."  He testified that he had not given the [petitioner], or anyone else, permission to enter the house that day.

Christopher Sims testified that he was currently imprisoned after pleading guilty to the aggravated burglary of the Hodges Street house. Several days before September 11, 2012, Sims went to Hodges Street and entered the house through an unlocked back door.  He first testified that he knew the house was vacant by "just looking around," although he later stated that the [petitioner] had told him about the vacant house.  Sims saw that there was a stove and refrigerator in the house, but he left the house without removing any property.  The [petitioner] was not with Sims during this initial entry into the house.

Sims testified that on the afternoon of September 11, 2012, he and the [petitioner] discussed the appliances located at the Hodges Street house. Because neither Sims nor the [petitioner] had a vehicle, the [petitioner] enlisted the help of a friend who owned a truck to help them transport the appliances.  Sims testified that the driver picked both himself and the [petitioner] up at the home of Cheryl Fleming, Sims's mother and, at the time, the [petitioner's] girlfriend.  Initially, Sims testified that the appliances had already been taken out of the house and were sitting outside when the three men arrived at the house.  However, he later testified that the men arrived at the house, parking the truck on the street in front of the house, and that he and the [petitioner] then moved the appliances to the "middle of the backyard."  Sims testified that it took the men about five to ten minutes to move the appliances from the house into the backyard.

Roshella Mabroy testified that she lived in the house next door to the burgled house on Hodges Street and that she was home all day on September 11, 2012.  She heard a vehicle pull into her driveway around 3:30 p.m. and went to the side door of her house to see who had arrived. She was expecting her landlord to arrive around that time to do some repair

work at her house.  However, upon looking out the door, she saw a truck that she did not recognize in her driveway.  She noticed that there were three men in the truck, whom she recognized "from the neighborhood."  Two men were in the cab of the truck, and a third man was sitting in the truck bed.  She identified the [petitioner] as the passenger in the cab of the truck and identified Christopher Sims as the man riding in the truck bed.

Ms. Mabroy stuck her head out the door and told the men to get out of her driveway.  She watched as the truck pulled out of her driveway and then backed into the driveway next-door.  According to Ms. Mabroy, the "young fellow in the back got out," while the [petitioner] and the driver remained in the truck.  She watched as Sims opened the gate to the fence, and at that time, she noticed a stove and refrigerator sitting inside the fenced backyard.  She had never seen appliances sitting outside of the house before and had not noticed anything unusual before that day.  However, Ms. Mabroy admitted that she was not certain that the appliances had not been outside for several days because she could not see inside the fence when the gate was closed.

Upon seeing the stove and refrigerator, she "immediately" said, "don't bother that stove, that refrigerator, leave that alone."  Ms. Mabroy said that the [petitioner], who was "slouched down in the truck," asked her, "[Y]ou going to snitch[?]"  She responded, telling him, "[Y]ou're not going to be able to make it out of the driveway because it's broad daylight and all my neighbors [are] looking at you."  While she was talking to the [petitioner], Sims "grabbed the refrigerator . . . and was going to put it [in the truck]," but she told him not to, and the men left.  She testified that Sims was the only person she saw outside the truck, touching the appliances that day.

Sims's recollection of that day differed in several respects from Ms. Mabroy's testimony.  According to Sims, after he and the [petitioner] moved the appliances outside, the driver mistakenly backed his truck into Ms. Mabroy's driveway.  Sims testified that both he and the [petitioner] were outside the truck at the time it was backing into the driveway.  Sims testified that when Ms. Mabroy came out of the house, he was "trying to get out of the way ... [and] [the [petitioner]] was talking to her."  He also testified that he and the [petitioner] actually loaded the appliances onto the truck, but subsequently unloaded them and fled the scene after Ms. Mabroy threatened to call the police.  Sims denied that the State had promised him

anything in exchange for his testimony and instead had told him to "tell the truth and be honest" about what happened that day.

Gregory Scott of the Memphis Police Department (MPD) testified that he was the first responder to a "prowler call" on Hodges Street on September 11, 2012. He explained that a "prowler call" means that someone is at a residence that does not belong there. Upon arriving at the scene, Officer Scott walked to the rear of the house where he saw a stove and refrigerator sitting about six to ten feet from the back door, which was open. He described the fence enclosing the backyard as a "privacy fence." Officer Scott testified that no suspects were at the property when he arrived. He spoke to Ms. Mabroy, who recounted what she had witnessed. He testified that he did not recall collecting fingerprints from the appliances or any surfaces inside the house, although he could not state conclusively that no fingerprints were taken.

James McDonald, a Detective with the MPD, testified that he was the primary officer responsible for investigating the burglary. [Detective] McDonald testified that he went to the house on September 12, 2012, that the appliances had been moved back into the house, and that the house was locked. To his knowledge, no fingerprints were taken from the appliances or from any other surfaces at the house. When [Detective] McDonald received an initial report about the incident, the [petitioner] had already been listed as a suspect and was subsequently brought in for questioning. During the interrogation, the [petitioner] denied any involvement in the burglary, and the police did not take an official statement.

Cheryl Fleming testified for the defense. Ms. Fleming stated that Christopher Sims is her son and that she was dating the [petitioner] on September 11, 2012, but that they were no longer together. At the time, both Sims and the [petitioner] lived with her on Buntyn Street, which is located one street over from Hodges Street.

Ms. Fleming testified that on September 11, 2012, the [petitioner] was with her the entire morning and through the early afternoon. Sims was at the house that morning but left around 1:00 or 2:00 p.m. A little later, the [petitioner] "called for a ride[;]" Sims returned to the house; and a gray truck, driven by a man identified at trial only by his nickname, "TK[,]" arrived at the house.

- 4 -

Sims exited the house and walked down an alley behind Ms. Fleming's house that leads to Hodges Street. Shortly thereafter, the [petitioner] got in the truck with TK, and the men drove towards Hodges Street. Ms. Fleming clarified that Sims left the house on foot prior to the [petitioner] and TK's departure in the truck. She also stated that up until this time, the [petitioner] had been with her the entire day.

Ms. Fleming followed Sims down the alley because she "was trying to stop them from doing whatever they was trying to do because [she] knew it was wrong." After seeing the men arrive on Hodges Street, Ms. Fleming decided to return to her house because she did not think it was "a good idea to stay around . . . because [she] didn't want to be a part of it."

The [petitioner] testified that he was home with Ms. Fleming on September 11, 2012, and between 2:00 and 3:00 p.m., Sims came to the house with his friend, Dennis Hodges. The [petitioner] testified that he was not "aware personally" of any refrigerator or stove before speaking with Sims that afternoon. After a short conversation, Sims and Mr. Hodges left the house. The [petitioner] then called his friend, TK, for a ride. TK came to the house and picked the [petitioner] up, and they drove to Hodges Street. TK was driving the truck, and the [petitioner] was in the cab on the passenger side.

The [petitioner] testified that when he and TK first drove to Hodges Street, Sims and Mr. Hodges were nowhere to be seen. The [petitioner] and TK returned to Ms. Fleming's house; Sims came back into the house; and the men again departed to Hodges Street. When they arrived back on Hodges Street, TK backed the truck into Ms. Mabroy's driveway, but the truck was moved into the driveway next door after Ms. Mabroy came outside and told them to get out of her driveway. Sims was attempting to get the stove onto the truck but abandoned the attempt due to Ms. Mabroy's threats to call the police. The [petitioner] testified that he did not get out of the truck, touch either of the appliances, or enter the house at any point. According to the [petitioner], Mr. Hodges helped Sims move the appliances out of the house, and "from [his] understanding" the appliances were "sitting out already in the backyard" before they drove to the house that afternoon.

The [petitioner] spoke to [Detective] McDonald about a week after the incident. He denied knowing anyone in the neighborhood and denied any involvement in the burglary. At trial, the [petitioner] admitted that he

lied when he said he did not know anyone in the neighborhood. However, he maintained that he was telling the truth about never entering the house and about not being aware of the burglary until after it occurred.

On cross-examination, the [petitioner] said that it was "difficult for [him] to try and explain [his] whole testimony" without being able to testify about what Sims said to him, and he further stated that it was Mr. Hodges who helped Sims move the appliances out of the house. The [petitioner] said that, although Ms. Mabroy thought he asked "you going to snitch[?]" what he really said to her was "you with the s--t." He explained that this means "you ain't cool, like you're not a cool person" and that he said this to Ms. Mabroy because she was threatening to call the police.

The jury convicted the [petitioner] of the lesser included offense of facilitation of aggravated burglary, and the trial court sentenced the [petitioner] to eight years to be served at thirty-five percent.

*State v. Poole*, No. W2014-00123-CCA-R3-CD, 2015 WL 832424, at *1-4 (Tenn. Crim. App. Jan. 30, 2015), *perm. app. denied* (Tenn. June 11, 2015) (internal footnotes omitted).

Further, on appeal, this Court explained the procedural background surrounding the petitioner's untimely motion for new trial and its effect on his direct appeal, stating:

The trial court sentenced the [petitioner] and entered a judgment of conviction on December 5, 2013. The [petitioner] filed a motion for new trial on January 9, 2014, approximately four days past the thirty-day requirement of Tennessee Rule of Criminal Procedure 33. Based on the late filing, the trial court questioned its jurisdiction to hear the motion but nevertheless denied the motion for new trial on the merits on January 15, 2014. This [C]ourt entered an order waiving the timely filing of the [petitioner's] notice of appeal on January 24, 2014, and the [petitioner] filed his notice of appeal on January 31, 2014.

"A motion for new trial *shall* be in writing or, if made orally in open court, be reduced to writing, within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b) (emphasis added). The thirty-day period for filing a motion for new trial "is jurisdictional and cannot be expanded." *State v. Hatcher*, 310 S.W.3d 788, 800 (Tenn. 2010). As such, "[a] trial judge does not have jurisdiction to hear and determine

- 6 -

the merits of a motion for new trial which has not been timely filed." *State v. Bough*, 152 S.W.3d 453, 460 (Tenn. 2004).

Failure to timely file a motion for new trial causes all issues to be "deemed waived except for sufficiency of [the] evidence and sentencing." *Bough*, 152 S.W.3d at 460; *see* Tenn. R. App. P. 3(e). Likewise, a notice of appeal must be filed "within [thirty] days after the date of entry of the judgment appealed from." Tenn. R. App. P. 4(a). An untimely motion for new trial will not toll this thirty-day period. *State v. Davis*, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987). While this court may waive the untimely filing of a notice of appeal pursuant to Tennessee Rule of Appellate Procedure 4(a), we do not have the authority to waive the untimely filing of a motion for new trial. *State v. Stephens*, 264 S.W.3d 719, 728 (Tenn. Crim. App. 2007).

Because the [petitioner] filed his motion for new trial four days late, the trial court was without jurisdiction to rule on the motion. Nevertheless, on appeal the [petitioner] may still challenge the sufficiency of the evidence, and we may also review issues normally considered waived pursuant to the plain error doctrine. Tenn. R. App. P. 36(b).

*Id.* at *4. Accordingly, on appeal, this Court reviewed the sufficiency of the evidence upholding the petitioner's conviction, specifically as it related to accomplice testimony, and examined the adequacy of the jury instructions provided at trial. Upon our review of the issues raised, this Court determined the petitioner was not entitled to relief and upheld the petitioner's conviction and sentence. *Id.* at *1-9.

The petitioner then filed a *pro se* petition for post-conviction relief, which was later amended after appointment of counsel. In his amended petition, the petitioner alleged: (1) "[t]rial counsel was ineffective for failing to timely file [the] [p]etitioner's [m]otion for [n]ew [t]rial, which effectively barred many of [the] [p]etitioner's claims from appellate review;" (2) "[t]rial counsel failed to request special jury instructions in writing;" and (3) "[t]rial counsel failed to properly investigate [the] [p]etitioner's case." The post-conviction court held an evidentiary hearing during which trial counsel and the petitioner testified. The post-conviction court summarized the evidence from the evidentiary hearing, as follows:

An evidentiary hearing was conducted on January 25, 2017. The first witness to testify was [trial counsel]. He has been an attorney since 1991. He represented the [p]etitioner as a public defender at trial. With regard to the investigation, he spoke with the [p]etitioner and obtained the

- 7 -

name of any witnesses he wanted him to talk to[,] obtained discovery, and had an investigator speak to the persons listed in the discovery. He also made a personal visit to the scene. [The petitioner] rejected the State's offer to settle and wanted to go to trial.

[The petitioner] was sentenced to 8 years as a Range II Offender. [Trial counsel] did not timely file the motion for new trial in the case, but he did file such a motion which was heard on the merits by the trial judge. [Trial counsel] did not handle the direct appeal, but it was appealed by another member of the public defender's office. He testified that [the] [p]etitioner was sentenced on December 5th but the motion for new trial was not set to be heard until January 14th, more than 30 days after the sentencing. He testified that he was thinking about the 14th as the "30-day date." [The record reflect[s] the motion for new trial was actually filed on January 9, 2014, and was denied on January 15, 2014]. [Trial counsel] could not recall any conversation with [the petitioner] regarding the filing of a motion for new trial. He did know that it was late when he drafted the motion for new trial.

When asked by [the] [p]etitioner's post-conviction counsel if he had it to do over, would he have done anything differently, [trial counsel] testified the only thing he would have done differently was to "timely" file the motion for new trial. As far as the trial, itself, he would not have done anything differently.

The next witness to testify was [the petitioner]. He gave [trial counsel] the names of no witnesses. The only witness was the next-door neighbor. He did not feel [trial counsel] fully investigated the case. Specifically, he should have talked to more witnesses, including those that "stayed" across the street.

With regard to the trial, he believed that [trial counsel] did not fully cross-examine his co-defendant, Mr. Sims, especially with regard to a possible deal with the prosecution. With regard to corroboration, he testified that there was no corroboration of his testimony. He based this upon some inconsistent statements attributed to Mr. Sims. He further complained that the jury was not instructed on the need for accomplice testimony to be corroborated.

With regard to the motion for a new trial, [the petitioner] testified that it was his desire to have a motion for new trial and that he expressed

- 8 -

that desire with [trial counsel]. He never discussed any grounds with [trial counsel].

After its review, the post-conviction court found the petitioner failed to prove prejudice as to any of his claims. Regarding trial counsel's failure to investigate the case, the post-conviction court stated because the petitioner failed to present "undiscovered witnesses or other evidence" at the hearing, the petitioner "failed to prove either 'deficient performance' or 'prejudice' in this matter." As to trial counsel's failure to request special jury instructions regarding accomplice testimony in writing, the post-conviction court agreed with this Court's review of the same on direct appeal wherein we concluded the issue was harmless. The post-conviction court also stated, "in this case the evidence of corroboration was abundant." Finally, in reviewing the petitioner's claim as to trial counsel's failure to timely file a motion for new trial, the post-conviction court stated "[t]here is no doubt that [trial] counsel provided 'deficient performance,'" but, "the motion that was actually untimely filed only included issues challenging the sufficiency of the evidence and the sentencing, neither of which was required to be in a timely filed motion for new trial to be raised on appeal." Accordingly, the post-conviction court denied relief, and this appeal followed.

## ANALYSIS

On appeal, the petitioner generally asserts his conviction and sentence are "invalid and [he] should be awarded a new trial because he did not receive effective assistance of counsel during his trial." The petitioner relies on trial counsel's untimely filing of his motion for new trial in support of his post-conviction claims, stating trial counsel's failure resulted in "a 'complete failure' to subject the [p]etitioner's case to the adversarial appellate process." The State asserts trial counsel's deficient performance in failing to timely file the motion for new trial did not prejudice the petitioner and, as such, the petitioner's claims are meritless. Following our review of the record and submissions of the parties, we affirm the judgment of the post-conviction court.

The petitioner bears the burden of proving his post-conviction allegations by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo*, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations

- 9 -

*de novo*, affording a presumption of correctness only to the post-conviction court's findings of fact. *See id*.; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id*. Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*.; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Here, the petitioner relies on *Wallace v. State* to support his proposition that trial counsel's deficiency in failing to timely file his motion for new trial was ineffective and

resulted in his case not being subjected to "the adversarial appellate process." 121 S.W.3d 652, 659 (Tenn. 2003). However, the petitioner's reliance on *Wallace* is misplaced. Like in the petitioner's case, the motion for new trial was untimely filed in *Wallace*. However, in *Wallace*, as a result of the untimely filing, the petitioner did not receive appellate review of specific issues raised in the motion for new trial regarding alleged errors at trial as to evidentiary issues and comments the trial judge made in front of the jury. In determining whether Wallace was entitled to post-conviction relief as a result of trial counsel's untimely filing of the motion for new trial, our Supreme Court held "a petitioner in a post-conviction proceeding must establish that he or she intended to file a motion for new trial and that but for the deficient representation of counsel, a motion for new trial would have been filed raising issues in addition to sufficiency of the evidence." *Id.* Further, the court held, "[a]s a direct result of counsel's ineffective assistance, the defendant was procedurally barred from pursuing issues on appeal, and the State's case was not subjected to adversarial scrutiny upon appeal." *Id.* at 660.

Here, however, the *Wallace* court's reasoning does not apply. According to the record, the petitioner's motion for new trial challenged only the sufficiency of the evidence and sentencing, and this Court reviewed the sufficiency challenge on direct appeal.[1] In his motion for new trial, the petitioner did not raise any issues for appellate review that were not examined on direct appeal, and he failed to identify any additional issues that should have been raised in the motion at the evidentiary hearing. Although trial counsel was deficient in failing to file a motion for new trial, the petitioner has failed to show how the untimeliness of the motion prejudiced him. Instead, the record indicates the petitioner received direct appellate review of the issues raised in his motion for new trial, and he is not entitled to post-conviction relief as a result. *Poole*, No. W2014-00123-CCA-R3-CD, 2015 WL 832424, at *4-9; *Wallace*, 121 S.W.3d at 659.

In denying post-conviction relief, the post-conviction court stated, "[a]bsent proof of some other possible appellate issue that [the] [p]etitioner wanted included in his motion for new trial, [the] [p]etitioner has failed to establish the 'prejudice' prong required to prove ineffective assistance of counsel." We agree with the post-conviction court's assessment of the petitioner's claims. No evidence exists in the record to support how trial counsel's alleged deficient performance affected the outcome of his trial or appellate review of the same. *See Strickland*, 466 U.S. at 687. The petitioner is not entitled to post-conviction relief for his claim of ineffective assistance of counsel.

---

[1]The record shows appellate counsel chose not to challenge the petitioner's sentence on appeal.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE